## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

TATIANA BRODISKI, on Behalf of Herself and All Others Similarly Situated,

    Plaintiff,

 v.

AUGUSTINE INSTITUTE, INC.,

    Defendant.

---

## CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiff Tatiana Brodiski ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, bring this class action complaint against Defendant Augustine Institute, Inc. ("Augustine Institute" or "Defendant") which owns and manages a video streaming service at https://formed.org/ (the "Website"). On the Website, Defendant utilized Meta, Inc.'s ("Meta" or "Facebook") to intercept and disclose consumers' video watching information and personally identifiable information without seeking or obtaining consumers' consent. Defendant's use of the Pixel resulted in violations of the Video Privacy Protection Act ("VPPA"), federal and state wiretap laws, and invasions into consumers' privacy. Plaintiff alleges the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiff, which are alleged upon personal knowledge.

### NATURE OF THE ACTION

1.      This is a class action brought on behalf of all persons who subscribed to Defendant's Website and subsequently watched pre-recorded video materials (the "Subscribers").

2.      Defendant produces catechetical videos, records audio drama productions, publishes books, and distributes Catholic media materials.

3.      The Website allows consumers to stream thousands of movies, children's programs, eBooks, audio, parish programs, and studies on demand for $9.99/month or $100.00/year. Consumers can also sign up to receive newsletters and product updates or sign up for a 7-day free trial by providing their personal information.

4.      In short, Defendant is in the business of providing pre-recorded videos to Subscribers.

5.      In all instances, the searching and streaming of Defendant's videos are monitored by third parties as a result of Defendant's decision to place the Pixel on each individual page containing Defendant's video materials on the Website.

6.      Defendant does not disclose to Subscribers that their personally identifying information ("PII"),[1] video watching information, and precise webpage information (collectively, "Sensitive Information") would be captured by Facebook, and then transmitted to third parties.

7.      The Website does not inform Subscribers that their Sensitive Information will be exposed, available, and readily usable by any person of ordinary technical skill who receives that data.

8.      At no point during or after the account sign up process does Defendant seek or obtain consent for the sharing of Subscribers' Sensitive Information, which Defendant surreptitiously gathered through the use of the Pixel that it chose to employ on the Website. Assuming Defendant's Terms had been presented to Subscribers,[2] the Terms still do not warn Subscribers that their Sensitive Information will be disclosed to Facebook.

---

[1] 18 U.S.C. § 2710(a)(3) ("includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider").

[2] Defendant's Terms are hyperlinked above the "Start subscription" button on the sign-up page, accompanied by the following text: "By clicking below, you agree . . . ." This "sign-in wrap" agreement does not sufficiently put consumers on notice of the agreement. *Morrison v. Yippee Ent.*

*Video Privacy Violations*

9.      In today's data driven world, a company's data sharing policies for a service or subscription are important factors for individuals to consider in deciding whether to provide personal information to that service or commit to a subscription.

10.     Congress has recognized the immediate and irreversible harm caused by associating and disclosing a person's personally identifiable information in conjunction with their video watching information.

11.     Congress' enactment of the VPPA, and its continued endorsement of the statute, supports that recognition. The VPPA prohibits video tape service providers ("VTSP"),[3] such as Defendant, from sharing consumers' PII without valid consent.[4]

12.     Congress made clear that the harm to individuals impacted by VPPA violations occurs the moment, and each time, a subscriber's information is shared.

13.     On the Website, because of Defendant's decision to employ the Pixel on the Website, a Subscriber's Sensitive Information is shared *the moment* the Subscriber requests video materials.[5]

14.     Defendant purposefully implemented and utilized the Pixel, which tracks

---

*Inc.*, No. 24-CV-0797-MMA-KSC, 2024 WL 4647296, at *13 (S.D. Cal. Oct. 31, 2024) (denying Defendant's motion to compel arbitration).

[3] VTSP refers to "any person, engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials . . . ." 18 U.S.C. § 2710(a)(4).

[4] 18 U.S.C. § 2710(b)(2)(B)(i)-(iii).

[5] As defined by the VPPA, protected "personally identifiable information" includes information which identifies a person as having "*requested* or obtained" video materials. *See* 18 U.S.C. § 2710(a)(3). When a website user clicks a link leading to a video, the user "requests" authorization to access the material from the website's server and, if authorized, the server then sends the data to the user. *See How the web works*, MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited Feb. 6, 2025).

Subscribers' activity on the Website and discloses that information to Facebook to gather valuable marketing data. The Pixel could not be placed on the Website without steps taken directly by or on behalf of Defendant (*see* Section B(1)).

15.     To be clear, the Pixel cannot be placed on a website by Facebook.  Only a website owner can place the Pixel on a website. Here, the Pixel was utilized on the Website, and effectuates the sharing of Subscribers' PII.  None of this could have occurred without purposeful action on the part of Defendant.

16.     Defendant does not seek and has not obtained consent from Subscribers to utilize the Pixel to track, share, and exchange their Sensitive Information with Facebook.

17.     When a party, such as Defendant, utilizes the Pixel, it is provided with details about its functionality, including the collection and disclosure of its Subscribers' Sensitive Information.[6]

18.     In fact, it is made aware that one of the functions of the Pixel is to collect and share Sensitive Information to "use that information to provide measurement services[] [and] target and deliver ads."[7]

19.     Facebook also advises and directs website owners that there are notice and consent requirements associated with the use of the Pixel and that website owners are responsible for providing that notice and obtain those consents.

---

[6]     *See,   e.g.,   Meta   Business   Tools   Terms*, FACEBOOK   (Apr.   25,   2023), https://www.facebook.com/legal/terms/businesstools ("You represent and warrant that you have provided robust and sufficiently prominent notice to users regarding the Business Tool Data collection, sharing and usage . . . Meta[] may use cookies web beacons and other storage technologies to collect or receive information from your websites . . . .").
[7] *Id.*

20.    Not only did Defendant know that Subscribers' Sensitive Information would be shared, it was on notice of its obligations to provide notice of its data gathering practices and obtain consent from Subscribers.

21.    Defendant cannot claim surprise as to the nature of the Pixel when Facebook itself warned websites utilizing the Pixel, aside from needing "a clear and prominent notice on each web page where [its] Pixels are used[,]" that they must "ensure, in a verifiable manner, that an end user provide[d] all necessary consents before [Augustine Institute] use[d] [Facebook's Pixel] to enable the storage of and access to Meta cookies . . . [i]n jurisdictions that require informed consent."[8]  Employing the Pixel on the Website caused Subscribers' PII to be shared with Facebook, resulting in VPPA violations.

22.    Defendant, despite its use of the Pixel on the pages of the Website containing pre-recorded video content, failed to obtain Subscribers' consent to allow the Pixel to operate in a way that shares Subscribers' Sensitive Information with Facebook.

*Wiretap Violations*

23.    Federal and state legislatures addressed citizens' privacy expectations when communicating with parties via electronic communications.

24.    Congress passed the Federal Wiretap Act, which prohibits the unauthorized interception of electronic communications.

25.    Defendant purposefully implemented and utilized the Pixel to intercept and read Subscribers' communications with the Website. Defendant knew that the Pixel would feed Subscribers' communications to Facebook. The Website does not provide notice of or obtain

---

[8] *Id.*; *see infra* Section B(4).

consent as to such practices.

26.     Subscribers of the Website have been harmed as a result of violations of the VPPA and the Federal Wiretap Act.  In addition to monetary damages, Plaintiff seeks injunctive relief requiring Defendant to immediately (i) remove the Pixel from the Website, or (ii) add adequate notices and obtain the appropriate consent from Subscribers.[9]

27.     Plaintiff's claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of herself and all other similarly situated persons. Plaintiff seeks relief in this action individually and on behalf of subscribers of the Website for violations of the VPPA, 18 U.S.C. § 2710, and the Wiretap Act, 18 U.S.C. § 2511(1)(a)-(e).

## **PARTIES**

28.     Plaintiff Tatiana Brodiski is, and has been at all relevant times, a citizen of Renton, Washington. Plaintiff Brodiski became a subscriber to Formed in or about September 2022. Plaintiff Brodiski used the Website for its intended purposes to access and view video content available to Plaintiff Brodiski through the Website. Plaintiff Brodiski used a Safari internet browser to view Defendant's video content while logged into her Facebook account on the same browser. Plaintiff Brodiski did not consent, agree, authorize, or otherwise permit Defendant to disclose her PII to Facebook. Plaintiff Brodiski was not provided with written notice that Defendant discloses Subscribers' PII, or detailed webpage viewing information or any means of opting out of such disclosures. Plaintiff Brodiski had her full name, a picture of himself, where she

---

[9] Website owners like Defendant also have the option to anonymize the video's title within the URL or encrypt the video title using hashing, as described by Facebook. *See Advanced Matching*, META,   https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching#security (last visited Feb. 6, 2025); *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools (last visited Feb. 6, 2025) ("When using a Meta image pixel or other Meta Business Tools, you or your service provider must hash [personally identifiable information] in a manner specified by us before transmission.").

is from and relationship status on her pubic Facebook profile. Defendant knowingly disclosed Plaintiff Brodiski's PII to Facebook. During the course of Plaintiff Brodiski's subscription to the Website, Defendant collected and shared her PII with Facebook each and ever time one of the Pixel Events occurred. Defendant has violated Plaintiff Brodiski's right to privacy under the VPPA and the Federal Wiretap Act. If not for these violations of her privacy, Plaintiff Brodiski would continue her use of the Website.

29.    Defendant Augustine Institute is a leading private Catholic graduate theology school located in Greenwood Village, Colorado. Defendant's mission is to create and bring faithful content to Catholics worldwide through their programs and platforms, including the Website.

## JURISDICTION AND VENUE

30.    The District Court for the District of Colorado has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from Defendant. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Video Privacy Protection Act, 18 U.S.C. § 2710, as well as the Federal Wiretap Act, 18 U.S.C. § 2511(1) (a)-(e).

31.    This Court has personal jurisdiction over Defendant because Defendant's principal place of business is in Colorado, and Defendant derives revenue in the State of Colorado, including Defendant's revenue generated from its management over and sales through the Website, including the revenue sharing, advertising sales, etc. that Defendant derives from the Website.

32.    Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391 because Defendant's principal place of business is located in this District and Defendant conducts substantial business operations in this District. In connection with the Website, the subscription sales, and associated coding, all claims originate and arise out of the Defendant's business operations in this District.

## COMMON FACTUAL ALLEGATIONS

### A. Legislative Background

### 1.    The Video Privacy Protection Act

33.    "The Video Privacy Protection Act follows a long line of statutes passed by the congress to extend privacy protection to records that contain information about individuals." S. Rep. No. 100-599 at 2 (1988).

34.    In 1988, a Washington-based newspaper published a profile of Supreme Court nominee Judge Robert H. Bork "based on the titles of 146 films his family had rented from a video store." *Id.* at 5. Senators took to the floor to denounce the act, troubled by disclosures of records that reveal Americans' purchases and rentals of videos and other audio-visual materials.

35.    Congress believed that these "information pools" created privacy interests that directly affected the ability of people to freely express their opinions, join in association with others, or enjoy the general freedoms and independence protected by the Constitution. *Id.* at 7.

36.    As Senator Patrick Leahy and the late Senator Paul Simon recognized, records of this nature offer "a window into our loves, likes, and dislikes," such that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems is a new, more subtle and pervasive form of surveillance." *Id.* at 7-8 (statements of Sens. Simon and Leahy, respectively).

37.     Senator Simon lamented that "[e]very day Americans are forced to provide to businesses and others personal information without having any control over where that information goes." *Id.* at 6-7.

38.     As a result, Senate Bill 2361 was drafted to "give meaning to, and thus enhance, the concept of privacy for individuals in their daily lives" by prohibiting "unauthorized disclosures of personal information held by video tape providers." *Id.* at 6.

39.     In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

40.     During a recent Senate Judiciary Committee meeting, "The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century," Senator Leahy stated that "[w]hile it is true that technology has changed over the years, we must stay faithful to our fundamental right to privacy and freedom. Today, social networking, video streaming, the 'cloud,' mobile apps and other new technologies have revolutionized the availability of Americans' information."[10]

41.     This application of the VPPA to modern video sources, such as websites, has been confirmed by various courts across the country.[11]

---

[10] *See Committee on the Judiciary, Subcommittee on Privacy, Technology and the Law, The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, SENATE JUDICIARY COMMITTEE SUBCOMMITTEE ON PRIVACY, TECHNOLOGY AND THE LAW, *available at* https://www.judiciary.senate.gov/download/hearing-transcript_-the-video-privacy-protection-act-protecting-viewer-privacy-in-the-21st-century (last visited Feb. 6, 2025).

[11] *See, e.g., Sellers v. Bleacher Report, Inc.,* 2023 U.S. Dist. LEXIS 131579, at *15-18 (N.D. Cal. July 29, 2023) (VPPA sufficiently applied to sports news website); *Jackson v. Fandom, Inc.,* 2023 U.S. Dist. LEXIS 125531, at *6 (N.D. Cal. July 20, 2023) (VPPA applies to gaming and

42.     The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1).

43.     The VPPA defines personally identifiable information as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3).

44.     A VTSP is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

45.     VTSPs are not required to deal exclusively in audio visual content; rather, audiovisual content need only be part of the provider's book of business. *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 547-48 (2d Cir. 2024).

46.     A consumer is "any renter, purchaser, or subscriber of goods or services from a video tape service provider[.]" 18 U.S.C. § 2710(a)(1).

47.     In interpreting the definition of VTSPs, the *Salazar* Court also reasoned that 'consumer' should be understood to encompass a renter, purchaser, or subscriber of *any* of the provider's 'goods or services'—audiovisual or not. *Salazar*, 118 F.4th at 548-49.

48.     The wide scope of consumer comports with the initial purpose of the VPPA, which was initially passed in 1988 for the purpose of protecting the privacy of individuals' video rental, purchase, and viewing data.

---

entertainment website); *Louth v. NFL*, 2022 U.S. Dist. LEXIS 163706, at \*11-12 (D.R.I. Sep. 12, 2022) (holding VPPA applied to NFL's videos accessible through mobile app).

49.    Under the statute, for each violation of the statute, a court may award actual damages (but not less than liquidated damages of $2,500.00 per person), punitive damages, equitable relief, and attorney's fees.

50.    Defendant here is a video service provider as it provided pre-recorded audio-visual materials to Plaintiff and Class Members on its Website.

51.    The relationship between Plaintiff and Defendant is precisely the type of relationship contemplated by the VPPA.

52.    In this case, Plaintiff's PII was knowingly and systematically disclosed to Facebook, without obtaining her consent.

**2.    The Federal Wiretap Act**

53.    The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[12]

54.    The Wiretap Act primarily concerned the government's use of wiretaps but Congress grew concerned that technological advancements like "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing" were rendering the Wiretap Act out of date.[13] Thus, in 1986, Congress amended the Wiretap Act through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[14]

---

[12] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).
[13] Senate Rep. No. 99-541, at 2 (1986).
[14] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, 29 WASH. & LEE J. C.R. & SOC. JUST. 187, 192 (2022).

55.    The ECPA primarily focused on two types of computer services that were prominent in the 1980s: (i) electronic communications like email between users; and (ii) remote computing services like cloud storage or third party processing of data and files.[15]

56.    Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

57.    While the ECPA allows a single party to consent to the interception of an electronic communication, single party consent is only acceptable where the communication is not "intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C. §2511(2)(d).

58.    While communicating with Defendant on the Website through their viewing choices, Subscribers had the contents[16] of their communications with Defendant intercepted by Facebook via the Pixel.

59.    Defendant purposefully included the Pixel on the Website to intercept Plaintiff's communications and redirect them to Facebook to improve the effectiveness of its and Facebook's advertising and marketing.

60.    Plaintiff did not know of or consent to the exposure of their legally protected communications with Defendant to Facebook.

---

[15] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).
[16] The contents of Plaintiff's and users' communications include: 1) the location and contents of webpages visited by users; and 2) the PII discussed in Section B(2)-(3).

**B. The Website and the Facebook Pixel**

61. Facebook offers the Pixel to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

62. On the Website, Defendant utilized the Facebook Pixel to intercept and disclose Subscribers' Sensitive Information without seeking or obtaining Subscribers' consent.

### *1. Defendant Implemented the Facebook Pixel on the Website*

63. The Pixel is a marketing tool that can only be added to a webpage by website developers. A website operator must sign up for a business account or link a related Facebook account with its Pixel, and then add code to the website to make use of the Pixel.[17]

64. As Facebook notes, the Pixel must be added to each individual page that a website owner wishes to be tracked.[18]

65. Here, Defendant took steps to add the Pixel to the Website.

66. The Pixel is employed by Defendant to gather, collect, and then share user information with Facebook.[19] Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[20] The sharing of Subscribers' PII benefits Defendant by improving the effectiveness of advertising targeted at Defendant's

---

[17] *Meta Business Help Center: Set up and install the Meta Pixel*, META, *available at* https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited Feb. 6, 2025).

[18] *Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started/ ("To install the Pixel, . . . add its base code . . . on every page where you will be tracking website visitor actions") (last visited Feb. 6, 2025).

[19] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, META, https://developers.facebook.com/docs/meta-pixel/ (last visited Feb. 6, 2025).

[20] *See Meta Pixel*, META, https://www.facebook.com/business/tools/meta-pixel (last visited Feb. 6, 2025).

Subscribers. Studies have shown that personalization in digital marketing through targeted and dynamic advertising can boost revenue by 15%.[21]

67.    Website owners and operators can choose to use the Pixel to share both user activity (including video watching activity) and user identity with Facebook. Here, Defendant's Website shares both.

68.    The harvested data can improve advertising by pinpointing audience demographics by interests, gender, or location and finding the people who are most likely to take action and view content.[22]

69.    The PII harvested by Defendant provides similar, if not more, data, including the titles of videos, whether through webpage URLs, parameters, or metadata, in addition to their Facebook profile data.

70.    The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, as well as whether or not any of the data within the Pixel transmission should be "hashed" (a form of encryption).

71.    To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where adding the Pixel to the website owner's "business portfolio" provides the most utility for using the Pixel.[23]  For instance, business portfolios can: (i) create and utilize more simultaneous Pixels; (ii) manage multiple Facebook Pages, Instagram accounts, ad

---

[21]  Wilson Lau, *What is Targeted Advertising?*, ADROLL BLOG (June 30, 2024), https://www.adroll.com/blog/what-is-targeted-advertising#:~:text=Benefits%20of%20Targeted%20Advertising,-1.%20Deliver%20a%20higher.
[22]  *See Audience ad targeting*, META, https://www.facebook.com/business/ads/ad-targeting (last visited Feb. 6, 2025).
[23]  *How to set up your Meta Pixel with a business portfolio*, META, https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited Feb. 6, 2025).

accounts, and catalogs from a centralized interface; (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees); (iv) post or analyze data analytics collected from Facebook pages or Instagram accounts; (v) run ads businesses across Facebook and Instagram; and (v) create and manage shops across Facebook and Instagram.[24]

72.     To add an operational Pixel to a website, the website owner or operator must take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[25]

73.     Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[26] and must connect the Pixel to a Facebook Ad account.[27]

74.     After following these steps, a website operator can start capturing and sharing information using the Pixel.

75.     A Pixel cannot be placed on a website by Facebook.  It must be placed directly by or on behalf of the site owner.  Augustine Institute did so.

### 2.   *The Pixel as a Tracking Tool*

76.     Once the Pixel is set and activated, it can begin collecting and sharing user activity data as instructed by the website owner.

---

[24] *About business portfolios*, META, https://www.facebook.com/business/help/486932075688253 (last visited Feb. 6, 2025).
[25] *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel*, YOUTUBE (Feb. 4, 2022), *available at* https://www.youtube.com/watch?v=ynTNs5FAUm8.
[26] *Add People to your Meta Pixel in Meta Business Suite or Business Manager*, META https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited Feb. 6, 2025).
[27] *Add an ad account to a Meta Pixel in Meta Business Manager*, META, https://www.facebook.com/business/help/622772416185967 (last visited Feb. 6, 2025).

77.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[28]

78.     This means that for Subscribers to the Website who are also Facebook users, their PII is certain to be shared. Their PII is automatically bundled with their web watching history and disclosed to Facebook when visiting a page with an active Pixel, including the home page.

79.     While the process to determine what information is being collected by the Pixel from a user is admittedly complicated, the recipient of the Pixel's transmissions receives the information in a clear and easy to understand manner.

80.     The seemingly complex data, such as the long URLs included in the Pixel's transmission, is "parsed," or translated into an easier to read format, such that the information is legible.

81.     For example, an embedded URL in a Pixel HTTP Request may look like an indecipherable code, as depicted below:



*Figure 1 – Sample Pixel Request*

---

[28] *Cookies Policy: What are cookies and what does this policy cover?*, META (Dec. 12, 2023), https://www.facebook.com/policy/cookies/.

82.     However, these URLs are designed to be "parsed" into easy-to-digest pieces of

information, as depicted below:



*Figure 2 – Parsed URL Information from Sample Pixel Request*

83.     Similarly, the cookies attached to the Pixel's transmissions are parsed, as depicted

below:



*Figure 3 – Cookie Data from Sample Pixel Request (c_user cookie redacted)*



*Figure 4 – Parsed Cookie Data from Sample Pixel Request (c_user cookie redacted)*

84.    PII can be used by anyone who receives the Pixel transmission to easily identify a Facebook user.

85.    A UID is personally identifiable information. It contains a series of numbers used to identify a specific profile, as depicted below:

*Figure 5 4 - Sample UID number of test account created by Plaintiff's counsel in a prior investigation into the Pixel, captured by a Pixel event*

86.    The information contained within the c_user cookie is considered PII. It contains "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior."[29] Because the Facebook ID number can simply and easily be appended to "www.facebook.com/" to navigate to the relevant user's profile, it requires no special skill or expertise to identify the user associated with the Facebook ID, and courts have regularly upheld its status as PII.[30]

---

[29] *In re Nickelodeon Consumer Privacy Litigation,* 827 F.3d 262, 290 (3d Cir. 2016).
[30] *See Lebakken v. WebMD, LLC* 2022 U.S. Dist. LEXIS 201010, at *11-12 (N.D. Ga. Nov. 4, 2022); *Czarnionka v. Epoch Times Ass'n*, 2022 U.S. Dist. LEXIS 209067, at *8-10 (S.D.N.Y. Nov. 17, 2022); *Ambrose v. Boston Globe Media Partners, LLC*, 2022 U.S. Dist. LEXIS 168403, at *5-6 (D. Mass. Sept. 19, 2022).

87.    Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]). That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID. Using the UID from *Figure 4*, appending it to the Facebook URL in a standard internet browser (here, www.facebook.com/100091959850832) will redirect the webpage straight to the Facebook profile associated with the UID, as depicted below:



*Figure 6 - Result of appending Sample UID of a user to "facebook.com/" being redirected to the user's profile created by Plaintiff's counsel in a prior investigation into the Pixel*

88.     Importantly, some Facebook profile information – name, gender, profile photo, cover photo, username, user ID (account number), age range, language, and country – are "always public."[31] No privacy setting on Facebook would allow Plaintiff, or any user, to hide this basic information.

89.     By compelling a user's browser to disclose the c_user cookie alongside event data for media content, Defendant knowingly discloses information sufficiently permitting an ordinary person to identify an individual.

### 3.    The Pixel Shares Subscribers' PII

90.     The Pixel tracks user-activity on web pages by monitoring events,[32] which when triggered, causes the Pixel to automatically send data – here, Subscribers' PII – directly to Facebook.[33] Examples of events utilized by websites include: (i) a user loading a page with a Pixel installed (the "PageView event")[34]; and (ii) when pre-designated buttons, like the "Start Free Trial" button, are clicked (the "SubscribedButtonClick" event).[35] The Website utilizes both.[36]

---

[31] *Control who can see what you share on Facebook*, FACEBOOK, https://www.facebook.com/help/1297502253597210 (last visited Feb. 6, 2025).

[32] *About Meta Pixel*, META, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited Feb. 6, 2025).

[33] *See generally id.*

[34] *Specifications for Meta Pixel standard events*, META, https://www.facebook.com/business/help/402791146561655?id=1205376682832142 (last visited Feb. 6, 2025).

[35] *Reference: Standard Events*, META, https://developers.facebook.com/docs/meta-pixel/reference/ (last visited Feb. 6, 2025).

[36] The presence of Pixel events, such as the Microdata and PageView events, can be confirmed by using the publicly available and free Meta Pixel Helper tool. *See About the Meta Pixel Helper*, META, https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited Feb. 6, 2025).

91.     When the Pixel Events are triggered, a "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[37]  This confirms that the Pixel Events sent data to Facebook. The HTTP Request includes a Request URL and embedded cookies such as the c_user cookie. It may also include information in its Payload,[38] such as metadata tags. A Request URL, in addition to a domain name and path, contains parameters. Parameters are values added to a URL to transmit data and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 7 – Mozilla's diagram of a URL, including parameters[39]*

92.     Defendant uses the Pixel to collect and share Website Subscribers' PII with Facebook. Defendant does not disclose its data sharing practices or obtain permission from its Subscribers to share their PII with Facebook.

93.     Defendant shares non-anonymized PII with Facebook. Defendant's disclosures include unique identifiers (the UID) that correspond to specific Facebook users. The recipient finds the PII and web watching history packaged together in a single data transmission which is easily readable by an ordinary person once the PII is packaged and delivered by the Website's Pixel.

---

[37] Surya Mattu et al., *How We Built a Meta Pixel Inspector*, THE MARKUP (Apr. 28, 2022 8:00 AM) https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector.

[38] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body.  Payloads typically transmit form data, image data, and programming data.  *See Request Payload Variation,* SITESPECT, https://doc.sitespect.com/knowledge/request-payload-trigger (last visited Feb. 6, 2025).

[39]     *What    is    a    URL?*,    MOZILLA,    https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 6, 2025).

94.     Defendant monetizes the Website's Subscribers by gathering Subscribers' marketing data and PII and disclosing that valuable information to Facebook. Defendant does so in a format which allows it to make a direct connection between the identity of a Subscriber and that Subscriber's PII, without the consent of its Subscribers and to the detriment of Plaintiff's and Class Members' legally protected privacy rights.

95.     Defendant had and continues to have the choice to design the Website so that the webpage URLs did not include the titles of videos. Defendant had, and has, the choice as to whether to purposefully include more information in the Website's URLs to improve website interaction and search engine optimization.[40] Here, Defendant chose to expose Subscribers' video information so that it could benefit from the tracking and sharing of Subscribers' PII.

96.     Defendant also had the power to implement the Pixel in a way that shielded Subscribers' Sensitive Information. Defendant chose, however, to transmit Subscribers' non-anonymized PII.[41]

97.     Sensitive data sent to Facebook through the triggered Pixel Events are included within the parameters of the Request URL, within the Request Header, or as a Payload within the request. The specific Pixel Events implemented by Defendant sends Subscribers' PII through the Request URL parameters and HTTP Headers.[42]

98.     An "HTTP Header" is a field of an HTTP Request or response that passes additional

---

[40] *See* Chima Mmeje, *Different Domain Types and Best Practices for SEO,* MOZ (Nov. 11, 2024) https://moz.com/learn/seo/domain.

[41] *See Advanced Matching*, META, https://developers.facebook.com/docs/meta-pixel/advanced/advanced-matching (last visited Feb. 6, 2025).

[42] URL parameters are values that are added to a URL to cause a web server to provide additional or different services. *What is a URL?,* MOZILLA, https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited Feb. 6, 2025).

context and metadata about the request or response.[43] Specifically, Request Headers are a subset of HTTP Headers that are used to provide information about a request's context, so that a server can customize its response to the request or supply authentication credentials[44] to the server or otherwise provide more information about the client sending the request.[45]

99.     Defendant shares with Facebook the specific films requested by Subscribers to the Website through Request URL parameters.

100.     These factual allegations are corroborated by publicly available evidence. For instance, a user visits the Formed Website, clicks on a series, such as "Mysteries of the Rosary | Paradisus Dei," and subsequently watches the film. Defendant's disclosure of this user's PII is portrayed in *Figures 7* and *8* below.



*Figure 8 – Sample episode webpage on the Website*

---

[43]  *HTTP header*, MOZILLA,  https://developer.mozilla.org/en-US/docs/Glossary/HTTP_header (last visited Feb. 6, 2025).
[44] *Id.*
[45] *Id.*



*Figure 9 – Video Title and UID included in URL parameters disclosed to Facebook through PageView Pixel Event on the Website*



*Figure 10 – Video Title included in URL parameters disclosed to Facebook through SubscribedButtonClick Pixel Event on the Website*



*Figure 11 – UID included in URL parameters disclosed to Facebook through
SubscribedButtonClick Pixel Event on the Website*

101.    As depicted above in *Figures 9* and *11*, Defendant also transmits Subscribers' PII
to Facebook in the form of an unencrypted and unique UID contained in the c_user cookie included
in the HTTP Request Header, which can be used to find a user's personal Facebook page, as
discussed in Section B(2) above.

102.    The information contained within the c_user cookie is considered PII because it
contains "the kind of information that would readily permit an ordinary person to identify a specific
individual's video-watching behavior."[46]  Because the UID can simply and easily be appended to
"www.facebook.com/" to navigate to the relevant user's profile, it requires no special skill or

---

[46] *In re Nickelodeon Consumer Privacy Litigation,* 827 F.3d 262, 290 (3d Cir. 2016).

expertise to identify the user associated with the Facebook ID, and courts have regularly upheld its status as PII.[47]

### 4. Defendant Was Told the Pixel Discloses Subscribers' Data; It Knew Precisely What the Pixel Would Collect and Share

103.    When a business applies with Facebook to use the Pixel, it is provided with detail about its functionality (site policy), including with respect to PII.[48]

104.    To make use of the Pixel, Defendant agreed to Facebook's Business Tool Terms (the "Business Terms").

105.    The Business Terms informs website owners using Facebook's Pixel that the employment of the Pixel will result in data sharing, including with Facebook, through the automatic sharing of Pixel Event information ("Event Data") and contact information ("Contact Information").[49]

106.    The Business Terms are transparent that Meta will use the Event Data and Contact Information will be processed "solely to match the Contact Information against user IDs ("Matched User IDs"), as well as to combine those user IDs with corresponding Event Data."[50]

---

[47] *See Lebakken v. WebMD, LLC* 2022 U.S. Dist. LEXIS 201010, at *11-12 (N.D. Ga. Nov. 4, 2022); *Czarnionka v. Epoch Times Ass'n*, 2022 U.S. Dist. LEXIS 209067, at *8-10 (S.D.N.Y. Nov. 17, 2022); *Ambrose v. Boston Globe Media Partners, LLC*, 2022 U.S. Dist. LEXIS 168403, at *5-6 (D. Mass. Sept. 19, 2022).

[48] *See Get Started*, META, https://developers.facebook.com/docs/meta-pixel/get-started (last visited Feb. 6, 2025) (The Pixel "relies on Facebook cookies, which enable us to match your website visitors to their respective Facebook User accounts. Once matched, we can their actions in the Facebook Ads Manager so you can use the data . . . . By default, the Pixel will track URLs visited [and] domains visited . . . .").

[49] *Meta Business Tools Terms*, FACEBOOK (Apr. 25, 2023), https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGod nMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr.

[50] *Id.*

107.    Facebook directs parties implementing the Pixel – here, Defendant – to encrypt request information[51] *before* data can be shared.[52]

108.    Facebook further provides Pixel users, such as Defendant, guidance on responsible data handling, and details how data is acquired, used, and stored, including which information is shared with Facebook.

109.    Facebook educates or reminds Pixel users of their responsibility to inform their Subscribers of their website's data sharing, and specifically guides website owners to obtain the requisite rights, permissions, or consents, before sharing information with any third-party.[53]

110.    As a sophisticated party entering into a business arrangement with another sophisticated party, Defendant was on notice of the potential privacy violations that would result from use of the Pixel, and ignored Facebook's warnings to safely handle its Subscribers' data and to warn its Subscribers that the Website would disclose information in a manner that threatened Subscribers' VPPA-protected PII.

### 5.    *The Website Does Not Obtain Subscribers' Informed, Written Consent Pursuant to the VPPA*

111.    The Website does not seek nor obtain permission from Subscribers, including Plaintiff and the Class, to share the Subscribers' PII with third parties, including Facebook.

112.    The sign-up process for Formed does not seek or obtain informed, written consent.

---

[51] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent. Defendant has specifically chosen the Pixel method which makes users' information visible. *See id.*

[52] *Id.*

[53] *Best practices for privacy and data use for Meta Business Tools*, META, https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited Feb. 6, 2025).



*Figure 12 – The Website's Account Registration Webpage*

113.    To the extent information about any of the Website's data sharing can be located,

the language is not (i) presented to consumers of the site in a transparent manner, or where it must

be viewed by visitors to the website; and (ii) offered to consumers as checkbox or e-signature

field, or as any form of consent; and (iii) presented in terms that sufficiently warn Subscribers

that their information, protected by the VPPA, will be shared with third parties.[54]

---

[54] *See Privacy Policy*, FORMED, https://watch.formed.org/privacy  (last updated Nov. 16, 2023).

## TOLLING

114.    The statutes of limitations applicable to Plaintiff's and the Class's claims were tolled by Defendant's conduct and Plaintiff's and Class Members' delayed discovery of their claims.

115.    As alleged above, Plaintiff and members of the Class did not know and could not have known when they used the Website that Defendant was disclosing their information and communications to third parties. Plaintiff and members of the Class could not have discovered Defendant's unlawful conduct with reasonable diligence.

116.    Defendant secretly incorporated the Pixel into the Website, providing no indication to Subscribers that their communications would be disclosed to Facebook.

117.    Defendant had exclusive and superior knowledge that Facebook's Pixel incorporated on its Website would disclose Subscribers' protected and private information and confidential communications, yet failed to disclose that by interacting with the Website, Plaintiff's and Class Members' Sensitive Information would be disclosed to Facebook.

118.    Plaintiff and members of the Class could not with due diligence have discovered the full scope of Defendant's conduct because the incorporation of Facebook's Pixel is highly technical and there were no disclosures or other indication that would inform a reasonable consumer or Website Subscriber that Defendant was disclosing and allowing the interception of such information Facebook.

119.    The earliest Plaintiff and Class Members could have known about Defendant's conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

120.    Plaintiff brings this action individually and on behalf of the following Class:

All persons in the United States with a subscription to the Website that had their Sensitive Information improperly disclosed to third parties through the use of the Pixel (the "Class").

121.    Specifically excluded from the Class are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

122.    Plaintiff reserves the right to amend the Class definitions above if further investigation and/or discovery reveals that the Class should be expanded, narrowed, divided into subclasses, or otherwise modified in any way.

123.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

124.    Numerosity (Rule 23(a)(1)): At this time, Plaintiff does not know the exact number of members of the aforementioned Class. However, given the popularity of Defendant's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

125.    Typicality of Claims (Rule 23(a)(3)): Plaintiff's claims are typical of those of the Class because Plaintiff, like all members of the Class, subscribed to, and used, the Website to watch videos, and had their Sensitive Information collected and disclosed by Defendant.

126.    Adequacy of Representation (Rule 23(a)(4)): Plaintiff will fairly and adequately represent and protect the interests of the Class. Plaintiff has no interests antagonistic to, nor in conflict with, the Class. Plaintiff has retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

127. <u>Superiority (Rule 23(b)(3))</u>: A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Because the monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein. If Class treatment of these claims is not available, Defendant will likely continue its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

128. <u>Commonality and Predominance (Rule 23(a)(2), 23(b)(3))</u>: There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

    a. Whether Defendant collected Plaintiff's and the Class's Sensitive Information;

    b. Whether Defendant unlawfully disclosed and continues to disclose the Sensitive Information of Subscribers of the Website in violation of the VPPA;

    c. Whether Defendant's disclosures were committed knowingly; and

    d. Whether Defendant disclosed Plaintiff's and the Class's Sensitive Information without consent.

129. Information concerning Defendant's Website's data sharing practices and account members is available from Defendant's or third-party records.

130. Plaintiff knows of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

131. The prosecution of separate actions by individual members of the Class would run the risk of inconsistent or varying adjudications and establish incompatible standards of conduct

for Defendant. Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

132.    Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

133.    Given that Defendant's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

**VIOLATION OF THE VIDEO PRIVACY PROTECTION ACT**
**18 U.S.C. § 2710, *et seq.***
**(On Behalf of Plaintiff and the Class)**

134.    Plaintiff hereby incorporates by reference and re-alleges each and every  allegation set forth above in in all preceding paragraphs of this Complaint.

135.    Plaintiff brings this count on behalf of herself and all members of the Class.

136.    The VPPA provides that "a video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer shall be liable to the aggrieved person for the relief provided in subsection (d)." 18 U.S.C. § 2710(b)(1).

137.    "Personally-identifiable information" is defined to include "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).

138.    A "video tape service provider" is "any person, engaged in the business, in or affecting interstate commerce, of rental, sale, or delivery of pre-recorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

139.    Defendant violated this statute by knowingly disclosing Plaintiff's and other Class Members' personally identifiable information to Facebook.

140.    Defendant, through the Website, engages in the business of delivering video content to Subscribers, including Plaintiff and the other Class Members, and other users. The Website delivers videos to Subscribers, including Plaintiff and the other Class Members, by making those materials available to Plaintiff and the other Class Members on the Website.

141.    Defendant is a "video tape service provider" because it curates, hosts, provides access to, and causes the delivery of thousands of videos on the Website, thereby "engag[ing] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

142.    Defendant solicits individuals to pay to subscribe to the Website.

143.    Plaintiff and members of the Class are "consumers" because they paid to subscribe to Defendant's Website. 18 U.S.C. § 2710(a)(1).

144.    Plaintiff and members of the Class viewed videos on the Website.

145.    Defendant disclosed Plaintiff's and Class Members' personally identifiable information to Facebook. Defendant utilized the Pixel which forced Plaintiff's web browser to transmit Plaintiff's identifying information, like her Facebook ID, along with Plaintiff's and Class Members' event data, including the title of the videos they viewed, to Facebook.

146.    Defendant knowingly disclosed Plaintiff's and Class Members' PII, which is triggered automatically through Defendant's use of the Pixel.  No additional steps on the part of Defendant, Facebook, or any third-party are required. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual to easily identify a Facebook user. *See* Section B(2) (process to identify an individual using a UID).

147.    Plaintiff and members of the Class did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to Facebook. Defendant failed to obtain "informed, written consent" from consumers – including Plaintiff and members of the Class – "in a form distinct and separate from any form setting forth other legal or financial obligations of the consumer" and "at the election of the consumer," either "given at the time the disclosure is sought" or "given in advance for a set period of time, not to exceed 2 years or until consent is withdrawn by the consumer, whichever is sooner." 18 U.S.C. § 2710(b)(2)(B)(i)-(ii).

148.    Defendant's disclosures of Plaintiff's and Class Members' PII were not made in the "ordinary course of business" as the term is defined by the VPPA. In particular, Defendant's disclosures to Facebook were not necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2). Instead, Plaintiff's and Class Members' PII was used for improving marketing effectiveness.

149.    In addition, the VPPA creates an opt-out right for consumers in 18 U.S.C. § 2710(2)(B)(iii). It requires video tape service providers to also "provide[] an opportunity for the consumer to withdraw on a case-by-case basis or to withdraw from ongoing disclosures, at the consumer's election." Defendant failed to provide an opportunity to opt out as required by the VPPA.

150.    On behalf of herself and the Class, Plaintiff seeks: (i) declaratory relief as to Defendant; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiff and the Class by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**Injunctive Relief Of Defendant's Ongoing VPPA Violations**

151.    An actual and immediate controversy has arisen and now exists between Plaintiff and the putative class she seeks to represent, and Defendant, which parties have a genuine and opposing interest in and which their interests are direct and substantial. Defendant has violated, and continues to violate, Plaintiff's and Class Members' rights to protect their PII under the VPPA.

152.    Plaintiff has demonstrated that they are likely to succeed on the merits of their claims, and are thus entitled to declaratory and injunctive relief.

153.    Plaintiff has no adequate remedy at law to stop the continuing violations of the VPPA by Defendant. Unless enjoined by the Court, Defendant will continue to infringe on the privacy rights of Plaintiff, Class Members, and the absent Class Members, and will continue to cause, or allow to be caused, irreparable harm to Plaintiff and Class Members. Injunctive relief is in the public interest to protect the PII of Plaintiff and Class Members, and other consumers that would be irreparably harmed through continued disclosure of their PII.

154.    Defendant completely disregards its obligation under the VPPA by loading the Pixel onto the Website and facilitating the sharing of consumers' PII with Facebook for any ordinary person to access and use.

155.    Despite brazenly violating the VPPA, consumers were provided with no notice of the employment of the Pixel and no indication of how or how much of their information was shared with Facebook. Worse, in further violation of the VPPA, Defendant did not seek or obtain any form of consent from subscribers for the use of the Pixel to share information improperly pulled from the Website.

156.    This threat of injury to Plaintiff and members of the Class from the continuous

violations requires temporary, preliminary, and permanent injunctive relief to ensure their PII is

protected from future disclosure.

**COUNT II**

**VIOLATION OF THE FEDERAL WIRETAP ACT**
**18 U.S.C. § 2510, *et seq*.**
**(On Behalf of Plaintiff and the Class)**

157.    Plaintiff hereby incorporates by reference and re-alleges herein the allegations

contained in all preceding paragraphs of this Complaint.

158.    Plaintiff brings this claim individually and on behalf of the members of the Class

against Defendant.

159.    Codified under 18 U.S.C. §§ 2510 *et seq*., the Federal Wiretap Act (the "Wiretap

Act") prohibits the interception of any wire, oral, or electronic communications without the

consent of at least one authorized party to the communication.

160.    The Wiretap Act confers a civil private right of action to "any person whose wire,

oral, or electronic communication is intercepted, disclosed, or intentionally used in violation of

this chapter." 18 U.S.C. § 2520(a).

161.    The Wiretap Act defines "intercept" as "the aural or other acquisition of the

contents of any wire, electronic, or oral communication through the use of any electronic,

mechanical, or other device." 18 U.S.C. § 2510(4).

162.    The Wiretap Act defines "contents" as "includ[ing] any information concerning

the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8).

163.    The Wiretap Act defines person as "any employee, or agent of the United States

or any State or political subdivision thereof, and any individual, partnership, association, joint

stock company, trust, or corporation." 18 U.S.C. § 2510(6).

164.    The Wiretap Act defines "electronic communication" as "any transfer of signs,

signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part

by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce . . . ." 18 U.S.C. § 2510(12).

165.    Defendant is a person for purposes of the Wiretap Act.

166.    The Pixel constitutes a "device or apparatus which can be used to intercept a wire, oral, or electronic communication." 18 U.S.C. § 2510(5).

167.    The confidential communications Plaintiff and members of the Class had with the Website, in the form of their browsing information, were intercepted by Facebook and such communications were "electronic communications" under 18 U.S.C. § 2510(12).

168.    Plaintiff and members of the Class had a reasonable expectation of privacy in their electronic communications with the Website in the form of their browsing information. Even if Plaintiff and members of the Class had no reasonable expectation of privacy in the electronic communications, Plaintiff's and Class Members' electronic communications with the Website included descriptions and summaries of the pre-recorded video content they viewed along with their PII, giving rise to a reasonable expectation of privacy under the VPPA.

169.    Plaintiff and members of the Class reasonably expected that third parties were not intercepting, recording, or disclosing their electronic communications with the Website.

170.    Within the relevant time period, the electronic communications between Plaintiff and members of the Class and the Website were intercepted during their transmission, without consent, and for the unlawful and wrongful purpose of monetizing their private information, which includes the purpose of using such private information to develop advertising and marketing strategies.

171.    Interception of Plaintiff's and Class Members' confidential communications with the Website occurs whenever a user navigates various webpages of the Website.

172.    At all times relevant to this Complaint, Defendant's conduct was knowing, willful, and intentional, as Defendant is a sophisticated party with full knowledge regarding the functionality of the Pixel, including that allowing the Pixel to be implemented on the Website would cause the communications of their users to be shared with Facebook.

173.     Plaintiff and members of the Class were never asked for their consent to share their confidential electronic communications with the Website with Facebook. Indeed, such consent could not have been given as none of Facebook, Defendant or the Website ever sought any form of consent from Plaintiff or members of Class to intercept, record, and disclose their private communications with the Website.

174.     As detailed above, Facebook's unauthorized interception, disclosure and use of Plaintiff's and the Class Members' confidential communications was only possible through Defendant's knowing, willful, or intentional placement of the Pixel on the Website. 18 U.S.C. § 2511(1)(a).

175.     Plaintiff and members of the Class have been damaged due to the unauthorized interception, disclosure, and use of their confidential communications in violation of 18 U.S.C. § 2520. As such, Plaintiff and members of the Class are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiff and members of the Class and any profits made by Facebook as a result of the violation, or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) appropriate equitable or declaratory relief; (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

## COUNT III

### INTRUSION UPON SECLUSION
### (On Behalf of Plaintiff and the Class)

176.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above in in all preceding paragraphs of this Complaint.

177.     Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

178.     Defendant intentionally intruded upon Plaintiff's and Class Members' solitude or seclusion in that it effectively placed Facebook in the middle of conversations including Sensitive Information to which it was not an authorized party.

179.    Defendant's participation in Facebook's tracking and interception of Sensitive Information was not authorized by Plaintiff or Class Members.

180.    Defendant's enabling of Facebook's intentional intrusion into Plaintiff's and Class Members' internet communications including PII and their computing devices and web-browsers was highly offensive to a reasonable person in that they violated federal and state criminal and civil laws designed to protect individuals' privacy and against theft.

181.    Secret monitoring of Sensitive Information is highly offensive behavior.

182.    Public polling on internet tracking has consistently revealed that the overwhelming majority of Americans believe it is important or very important to be "in control of who can get information" about them; to not be tracked without their consent; and to be in "control[] of what information is collected about [them]." The desire to control one's information is only heightened while a person is handling PII. Plaintiff and Class Members have been damaged by Defendant's facilitation of Facebook's intrusion upon their seclusion and are entitled to reasonable compensation including but not limited to disgorgement of profits related to the unlawful internet tracking.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a) For an order determining that this action is properly brought as a class action and certifying Plaintiff as the representative of the Class and their counsel as Class Counsel;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiff and the Class on all counts asserted herein;

(d) For entry of an order for injunctive and declaratory relief as described herein, including, but not limited to requiring Defendant to immediately (i) remove the Pixel from the Website or (ii) add, and obtain, the appropriate consent from Subscribers;

(e) For damages in amounts to be determined by the Court and/or jury;

(f) For an award of statutory damages or penalties to the extent available;

(g) For Defendant to pay $2,500.00 to Plaintiff and members of the Class, as provided by the VPPA, 18 U.S.C. § 2710(c)(2)(A);

(h) For pre-judgment interest on all amounts awarded;

(i) For an order of restitution and all other forms of monetary relief;

(j) An award of all reasonable attorneys' fees and costs; and

(k) Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury of all issues so triable.

Dated: February 13, 2025                          **JOHNSON FISTEL, LLP**

                                                  By: *Jeffrey A. Berens*
                                                  Jeffrey A. Berens
                                                  2373 Central Park Blvd., Suite 100
                                                  Denver, CO 80238
                                                  Telephone: (303) 861-1764
                                                  Email: jeffb@johnsonfistel.com

                                                  Mark S. Reich
                                                  Gary S. Ishimoto
                                                  **LEVI & KORSINSKY, LLP**
                                                  33 Whitehall Street, 17th Floor
                                                  New York, NY 10004
                                                  Telephone: (212) 363-7500
                                                  Facsimile: (212) 363-7171
                                                  Email: mreich@zlk.com
                                                  Email: gishimoto@zlk.com

                                                  Allen Carney
                                                  Courtney Ross Brown
                                                  **CARNEY BATES & PULLIAM, PLLC**
                                                  One Allied Drive, Suite 1400
                                                  Little Rock, Arkansas 72202
                                                  Telephone: (501) 312-8500
                                                  Email: acarney@cbplaw.com
                                                  Email: cbrown@cbplaw.com

                                                  *Counsel for Plaintiff*